*FOR PUBLICATON*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EUGENE MAZO and LISA MCCORMICK,<br><br>        Plaintiffs,<br><br>v.<br><br>TAHESHA WAY, in her official capacity as New Jersey Secretary of State, CHRISTOPHER DURKIN, in his official capacity as Essex County Clerk, E. JUNIOR MALDONADO, in his official capacity as Hudson County Clerk, JOANNE RAJOPPI, in her official capacity as Union County Clerk, PAULA SOLLAMI COVELLO, in her official capacity as Mercer County Clerk, ELAINE FLYNN, in her official capacity as Middlesex County Clerk, and STEVE PETER, in his official capacity as Somerset County Clerk,<br><br>        Defendants. | Civil Action No. 20-08174 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Eugene Mazo and Lisa McCormick ("Plaintiffs"), former candidates for Congressional seats in New Jersey, bring suit against Secretary of State Tahesha Way and County Clerks Christopher Durkin, E. Junior Maldonado, Joanne Rajoppi, Paula Sollami Covello, Elaine Flynn, and Steve Peter (collectively, "the Clerks"), alleging that Way denied their request to use certain political slogans on the primary ballot, which included the names of New Jersey incorporated associations or persons, but lacked written consent from those entities and persons, in violation of the First Amendment, and that the Clerks unconstitutionally declined to print those slogans. Plaintiffs seek to strike down N.J.S.A. §§ 19:23-17 and 25.1 ("the Slogan Statutes") as a result.

Defendants now move to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). The Clerks primarily contend that they had no say in whether Plaintiffs could use their preferred slogans, and no discretion to print them otherwise.[1] Way contends that the Court lacks subject matter jurisdiction because the 2020 primary is over, the 2022 primary is some time away, and the Slogan Statutes are constitutional under any standard of scrutiny. For the following reasons, I **GRANT** both motions to dismiss.

## I.        FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Mazo and McCormick ran for Congress in 2020 but lost in the primaries. Am. Compl., ¶¶ 14-15, 23, 25. At issue are New Jersey's Slogan Statutes. N.J.S.A. § 19:23-17 permits primary candidates to request a six-word slogan to appear on the ballot next to their names. The slogan must "be for the purpose of indicating either any official act or policy to which he is pledged or committed, or to distinguish him as belonging to a particular faction or wing of his political party." *Id.* But "no such [ ] slogan shall include or refer to the name of any such person or any incorporated association of this State unless the written consent of such person or incorporated association of this State has been filed with the petition of nomination of such candidate." *Id.* If a candidate's slogan includes a name but lacks consent, it cannot be printed. N.J.S.A. § 19:23-25.1.

Both candidates allege that they could not use their preferred slogans in 2020. Mazo originally asked to use "Essex County Democratic Committee, Inc.," "Hudson County Democratic Organization," or "Regular Democratic Organization of Union County." Am. Compl., ¶ 37. State officials[2] rejected them all, informing Mazo that he needed to obtain consent from the named

---

1        Rajoppi moved to dismiss first. ECF No. 51. Covello and Flynn joined her motion. ECF Nos. 53, 55. Durkin, Maldonado, and Peter have neither joined nor filed their own motions, but this Opinion applies to them as well.

2        The Amended Complaint is unclear on this point, but it appears that the Division of Elections is solely responsible for reviewing candidates' slogans. Am. Compl., ¶¶ 41-44.

groups or else his nomination petition would read "NO SLOGAN." *Id.* ¶ 38. Mazo ultimately used a slogan authorized by an association he incorporated. *Id.* ¶ 39. McCormick originally asked to use "Not Me. Us.," which apparently names an organization in New Jersey, but learned that she could not do so without obtaining consent from the chairperson. *Id.* ¶¶ 41-42. She then sought to use "Bernie Sanders Betrayed the NJ Revolution," but never obtained permission from Bernie Sanders, so she could not use that slogan either. *Id.* ¶ 43-44. She settled for "Democrats United for Progress." *Id.* ¶ 45. Mazo and McCormick assert in their verified Amended Complaint that they will run for Congress again in 2022 using their preferred, though rejected, slogans. *Id.* ¶¶ 26, 40, 46.

New Jersey held its primaries on July 7, 2020. *Id.* ¶ 24. Five days before the election, Plaintiffs filed the instant lawsuit. ECF No. 1. On October 23, 2020, they filed an Amended Complaint, which contains one Count under the First and Fourteenth Amendments. ECF No. 45. Plaintiffs contend that the consent requirements in N.J.S.A. §§ 19:23-17 and 25.1 are an unconstitutional restriction on free speech and seek injunctive and declaratory relief.[3] Am. Compl., ¶¶ 48-68.

Rajoppi moved to dismiss on December 9, 2020, arguing that the Clerks are improperly named as defendants because they lack the authority to enforce the Slogan Statutes or depart from decisions made by State officials. Raj. Br., at 7-9. In short, the Clerks contend, they merely print what the Secretary approves. Way moved to dismiss on December 10, 2020, arguing that Plaintiffs' claims are moot as they relate to the 2020 primary because it is long over, yet unripe as they relate to the 2022 primary because it is speculative that Plaintiffs will use the same slogans without authorization if they run again. Way Br., at 8-11. Regardless, Way argues, the Slogan Statutes do

---

3    Plaintiffs originally sought nominal damages against all Defendants. They have conceded that claim as to Secretary Way under the Eleventh Amendment, but not as to the Clerks. Pl. Br., at 6, 27-28.

not run afoul of the First Amendment whatever the standard of scrutiny is: the State has a compelling interest in preserving election integrity and preventing voter deception, which the Statutes advance by ensuring that candidates have a legitimate relationship with any person or group they name, and an equally compelling interest in protecting the associational rights of anyone named in a slogan. Way Br., at 25-27. The Slogan Statutes are also narrowly tailored to fit these ends, Way contends, because they do not completely ban any speech, just the non-consensual use of some names. *Id.* at 28.

Plaintiffs oppose both motions. They contend that the Clerks "refused to print the slogans" despite being independent, elected officials who are "accountable for the content and format of the ballots" and operate beyond "the Secretary's control." Pl. Br. I, at 6-9, 10-13. Next, Plaintiffs contend that their case is both not moot and ripe. They reason that, because the nomination process is compressed to a couple of months and they expect to run again in 2022 with the same slogans, the harm they suffered is "capable of repetition yet evading review." Pl. Br. II, at 9-10. Finally, according to Plaintiffs, the Slogan Statutes are content based speech restrictions subject to strict scrutiny, which are not narrowly tailored to fit the State's asserted interests. *Id.* at 19-25. Plaintiffs suggest that the State could place a general disclaimer on ballots, alerting voters to the fact that slogans are unverified, as a less restrictive means of achieving the same ends. *Id.* at 25.

## II.   LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(1), a court may dismiss a claim if there is no subject matter jurisdiction. *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). A Rule 12(b)(1) motion can raise a facial attack or a factual attack, which determines the standard of review. *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (citations omitted); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017). On a facial attack,

courts "only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff," since the motion contests the sufficiency of the pleadings. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (quotations omitted); *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).

On a factual attack, courts may "consider evidence outside the pleadings," such as affidavits, since the motion contests the underlying basis for jurisdiction. *Gould Elecs. Inc.*, 220 F.3d at 176 (citing *Gotha v. United States*, 115 F.3d 176, 178-79 (3d Cir. 1997)); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ("[N[o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."); *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) ("[A] factual attack concerns the actual failure of [plaintiff's] claims to comport with the jurisdictional prerequisites.") (quotations and citation omitted). In such circumstances, the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," *Mortensen*, 549 F.2d at 891, but "must be careful [ ] not to allow its consideration of jurisdiction to spill over into a determination of the merits of the case, and thus must tread lightly." *Kestelboym v. Chertoff*, 538 F. Supp. 2d 813, 815 (D.N.J. 2008) (quotations and citation omitted). The proponent of jurisdiction bears the burden to prove that it exists throughout the litigation. *Mortensen*, 549 F.2d at 891.

A court may also dismiss an action under Fed. R. Civ. P. 12(b)(6) if a plaintiff fails to state a claim upon which relief can be granted. When evaluating a Rule 12(b)(6) motion, I must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty.*

*of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). A complaint survives dismissal if it contains sufficient factual matter, accepted as true, to "state a claim . . . that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To determine whether a complaint is plausible, a court conducts a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court "takes note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Second, it identifies allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 679). For example, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678, nor am I compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Third, "where there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago*, 629 F.3d at 131 (quoting *Iqbal*, 556 U.S. at 680). This is a "context-specific task that requires [me] to draw on [my] judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.   DISCUSSION

### A.   *Mootness and Ripeness*

The Constitution gives federal courts the power to adjudicate only genuine "Cases" and "Controversies." Art. III, § 2, cl. 1; *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). Courts enforce the case-or-controversy requirement through several "justiciability doctrines that cluster about Article III." *Allen v. Wright*, 468 U.S. 737, 750 (1984). These doctrines include "standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory

opinions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Toll Brothers, Inc. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009). While "the most important . . . is standing," *Allen*, 468 U.S. at 750-51, solely mootness and ripeness are at issue here.

    i.    Mootness

"[I]t is not enough that a dispute [is] very much alive when suit [is] filed." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotations and citation omitted). Article III's case-and-controversy requirement "subsists through all stages of" litigation. *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990); *Alvarez v. Smith*, 558 U.S. 87, 92 (2009). This means that courts do not have the power to hear disputes if they become moot. *Khodara Envtl., Inc. ex rel. Eagle Envtl., L.P. v. Beckman*, 237 F.3d 186, 192-93 (3d Cir. 2001). A dispute is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). The determinative question is "whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3d Cir. 2007) (quotations and citation omitted). "[I]f developments occurring during the course of adjudication eliminate [the] plaintiff's personal stake in the outcome . . . , then a federal court must dismiss the case." *Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016) (quotations and citation omitted). But mootness sets a high bar: it must be "impossible for a court to grant any effectual relief whatever." *Knox v. Service Employees*, 567 U.S. 298, 307 (2012) (quotations and citation omitted).

Way argues that Plaintiffs' claims are moot because the 2020 primary is over, the nominees proceeded to the general election, the results of that election are certified, the winners are sworn into office, and Plaintiffs used other slogans without issue, all of which suggests there is no longer

a live dispute concerning the Slogan Statutes. Way. Br., at 8. Without contesting those facts, Plaintiffs believe their claims fall within the "exception to the mootness doctrine for a controversy that is capable of repetition, yet evading review."[4] *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (citing *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). That exception applies "if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Turner v. Rogers*, 564 U.S. 431, 439-40 (2011); *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018).

I agree with Plaintiffs that their claims are "capable of repetition, yet evading review." Plaintiffs meet the first prong because New Jersey's primaries are too truncated to permit meaningful, if any, judicial review in normal procedural time before voters choose who to nominate. Candidates must file their slogans no more than 64 days before the election. N.J.S.A. § 19:23-14. The State need not certify slogans until there are 54 days to go, at which time it informs the Clerks of the names of the candidates who will appear on the ballot. *Id.* § 19:23-21. And the Clerks may print ballots anywhere from 50 days before the election to less than three, depending on the county. *Id.* § 19:23-22.4. This means that a last-minute candidate, who files a nominating petition at the deadline, could conceivably have as few as four days to challenge an adverse

---

4     Plaintiffs assert the First Amendment's overbreadth doctrine as an alternative basis for subject matter jurisdiction. Under that doctrine, a party may bring a facial challenge to a statute, even though it is not unconstitutional as applied to that party, because "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Such a party need only "satisf[y] the requirement of 'injury-in-fact'" to establish jurisdiction. Pl. Br. II, at 18-19 (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 953 (1984)). But Plaintiffs misapply the doctrine in this case. It is merely an exception to the "prudential limit[] on standing . . . . that a plaintiff generally must assert *his own* legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of others." *SEIU, Local 3 v. Municipality of Mt. Leb.*, 446 F.3d 419, 423 (3d Cir. 2006) (emphasis added). Satisfying it will not make a claim any less moot or more ripe.

determination on his slogan before some counties begin printing ballots, if the State also waits until the last minute to review it. Even a prudent candidate who timely submits her slogan will not generally have time to challenge the Slogan Statutes in court because the State does not make nominating petitions available until December or January before spring primary season. *Arsenault v. Way*, No. 16-01854, 2021 WL 1986667, at *4 (D.N.J. May 17, 2021) (describing short timeline). Plaintiffs also satisfy the second prong because, quite simply, "it is reasonable to expect political candidates to seek office again in the future." *Belitskus v. Pizzingrilli*, 343 F.3d 632, 636-37, 648 n.11 (3d Cir. 2003); *see also Davis v. F.E.C.*, 554 U.S. 724, 736 (2008) (observing that a case would not be moot if plaintiff intended to "self-finance another bid for a House seat"). That expectation obtains regardless of whether a plaintiff substantiates her plans with evidence. *Merle v. United States*, 351 F.3d 92, 94 (3d Cir. 2003) (holding that it was "reasonable to expect that Merle will wish to run for election either in 2004 or at some future date" without even allegations of intent to do so). Nonetheless, in their Verified Amended Complaint, Plaintiffs maintain that they will run again in 2022, which carries the same weight as an affidavit. *Real Alternatives, Inc. v. Sec'y of HHS*, 867 F.3d 338, 371 n.9 (3d Cir. 2017) ("A Verified Complaint is treated as an affidavit.").

Parties often proceed under the "capable of repetition, yet evading review" exception in election cases. *See, e.g.*, *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969) (holding that election law challenge was not moot "as long as [the state] maintains [its] present [laws]"); *Merle*, 351 F.3d at 95 (holding that election law challenge was not moot because it was reasonable to assume plaintiff would run for office again, and the same statute that caused plaintiff to sue would again bar candidacy); *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 18 (1st Cir. 1996) ("[Elections are routinely] too short in duration to be fully litigated, and there [is] a reasonable

expectation . . . that the same controversy will recur involving the same complaining party.") (collecting cases); *Branch v. F.C.C.*, 824 F.2d 37, 41 n.2 (D.C. Cir. 1987) ("Controversies that arise in election campaigns are unquestionably among those saved from mootness under the exception for matters 'capable of repetition, yet evading review.'"); *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003) ("Election cases often fall within this exception, because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits."); *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 545 n.1 (6th Cir. 2014) (same); *Worley v. Cruz-Bustillo*, 717 F.3d 1238, 1242 n.2 (11th Cir. 2013) (same); *De La Fuente v. Cortes*, 261 F. Supp. 3d 543, 549 (M.D. Pa. 2017) ("Cases in which apparently moot claims are likely to arise again have long been gathered under the 'capable of repetition yet evading review' exception."); *Arons v. Donovan*, 882 F. Supp. 379, 383 (D.N.J. 1995) ("The issues in the instant case are not moot merely because the election that gave rise to the request for injunctive relief is over."); *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 623-24 (E.D. Pa. 2018) ("[I]t is reasonable to assume that Plaintiffs would attempt to run for office in future elections. Furthermore, the present case is too short in duration to be fully litigated, and the same electoral misconduct is capable of repetition in future elections.").

Way's remaining arguments similarly find no sound footing. She first points to the basic, undisputed proposition that the "capable of repetition, yet evading review" exception is "narrow and available only in exceptional situations." Way. Rep. Br., at 3 (quoting *Brennan v. William Paterson College*, 492 Fed. App'x. 258, 265 (3d Cir. 2012)). Yet, courts have determined that election-related challenges such as the present one rise to that level, and Way recognizes as much elsewhere in her motion. *Id.* at 9 ("[T]he 'capable of repetition, yet evading review' doctrine is appropriate in election matters."). Way also argues that Plaintiffs have not made a "credible

showing that the Slogan Statutes would bar the use of their desired slogans and that they would be subject to the same harm in 2022." *Id.* at 4-5. That argument is better directed at ripeness (or even standing), *see infra*, since it goes to whether the allegedly harmful conduct will repeat as anticipated. *Cf. Vitek v. Jones*, 445 U.S. 480, 504 (1980) (Blackmun, J., dissenting) (explaining, in the context of ripeness, that "[a] hypothetical threat is not enough"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (holding that standing's injury-in-fact requirement cannot be "stretched beyond its purpose," *e.g.*, by a string of events that is too hypothetical or contingent to count as "imminent"). In any case, Way offers nothing more than a bare assertion that the conduct giving rise to this suit is unlikely to happen again, which is not sufficient to meet her "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000).

Way further argues that Plaintiffs' claims are moot because "[t]he mere act of running for office is not the triggering event for the application of the Slogan Statutes." Way Br., at 9. Rather, Way says, the triggering event is one step removed: seeking approval for a slogan. I disagree. For one, there is no reason to doubt that Plaintiffs will take advantage of the opportunity afforded by the Slogan Statutes should they decide to run in 2022, since they attempted to do so repeatedly in 2020. That fact is crucial. Moreover, entering the primary reasonably entails invoking the Slogan Statutes to communicate with voters, advocate for a certain brand of political reform, or support particular causes with particular viewpoints. Running for office goes hand in hand with engaging in such speech activity, and the two are highly correlated here as well.[5] *Cf. Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 329 (2010) ("[Political expression] is central to the meaning and purpose of the First Amendment."); *Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("[T]here is

---

5      It appears that a candidate designates a slogan on her nomination petition itself, which she must file at the outset to enter the primary, so these events actually happen in tandem. N.J.S.A. § 19:23-17.

practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.").

Stated differently, Way frames the "features of [this] particular series of [events]" as especially "unique" or attenuated when they are not, while overlooking record evidence—Plaintiffs' candidate history—which "apprises us of the likelihood of a similar chain." *Hamilton v. Bromley*, 862 F.3d 329, 336 (3d Cir. 2017) (some alterations in original); *New Jersey Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 33 (3d Cir. 1985). Viewed through the proper lens, it is plausible, neither too speculative nor tenuous, that each contingency will take place as alleged, and as it did in 2020. *Compare Int'l Organization of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 468-70 (1991) (rejecting mootness because candidate for union office needed to simply (1) run again and (2) face the same rule against preconvention mailing), *with Cephas v. Int'l Longshoremen's Ass'n*, 785 Fed. App'x. 89, 91 (3d Cir. 2019) (finding mootness because candidate would need to (1) run again, (2) win, (3) engage in similar behavior triggering investigation, and (4) not receive notice of discipline). Accordingly, Plaintiffs' challenge to the Slogan Statutes is not moot.

ii.   Ripeness

Way also argues that Plaintiffs' claims are not ripe because the next primary will not happen for some time. Like mootness, ripeness originates from the case-or-controversy requirement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014). Although it is "a matter of degree whose threshold is notoriously hard to pinpoint," *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (quotations and citation omitted), at its core, ripeness determines whether a plaintiff sues at the right time, *i.e.*, whether she has suffered a harm *yet*, or whether the threat of future harm is sufficiently imminent to constitute a cognizable injury.

*Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994); *Free Speech Coal., Inc. v. Att'y Gen. of United States*, 825 F.3d 149, 167 n.15 (3d Cir. 2016). The point is to ensure that the parties are in a "sufficiently adversarial posture," the facts of the case are "sufficiently developed," and the plaintiff is "genuinely aggrieved." *Plains*, 866 F.3d at 539; *Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*, 385 F.3d 801, 806 (3d Cir. 2004) (requiring a dispute to "have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them") (quotations and citation omitted).

The Supreme Court gauges ripeness in two principal ways: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The Third Circuit applies a "somewhat refined" test in declaratory judgment cases, where it is particularly "problematic" to define ripeness with precision. *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 195-96 (3d Cir. 2004). Courts must look to the (1) adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment. *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 647 (3d Cir. 1990). Although different in form, this test is not different in substance from *Abbott Lab*, whose factors "still guide [the] analysis." *Plains*, 866 F.3d at 540. Nor are the factors "exhaustive." *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 412 (3d Cir. 1992). Any ripeness analysis must heed the well-settled rule that courts should avoid deciding "federal constitutional matters in advance of the necessity of deciding them, to postpone judicial review where it would be premature." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring); *Artway v. Attorney Gen. of*

*N.J.*, 81 F.3d 1235, 1249 (3d Cir. 1996) ("Courts are particularly vigilant to ensure that cases are ripe when constitutional questions are at issue.") (citation omitted).

### 1.  Adversity of Interests

I begin with adversity of interests. "Parties' interests are adverse where harm will result if the declaratory judgment is not entered." *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995). If a "plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse." *Armstrong*, 961 F.2d at 411-12. This is no less true in the First Amendment context. *Salvation Army v. Dep't of Cmty. Affairs of N.J.*, 919 F.2d 183, 192 (3d Cir. 1990). However, "the party seeking review need not have suffered a 'completed harm' to establish adversity." *Florio*, 40 F.3d at 1463. "It suffices that there is a 'substantial threat of real harm and that the threat . . . remain real and immediate throughout the course of the litigation." *Plains*, 866 F.3d at 541 (quoting *id.*). The threat simply cannot be "imaginary or speculative," *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), as "[a] claim is not ripe for adjudication if it rests upon [ ] future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotations and citation omitted).

Plaintiffs argue that they will use—and the State will deny—their same preferred slogans again in 2022, which Way characterizes as "speculative at best." Way Br., at 12-13. However, the facts in this case support Plaintiffs' position. The State rejected Plaintiffs' slogans in 2020, under "binding election law," and there is no basis on which to conclude that the Slogan Statutes will operate to a different end in 2022. *De La Fuente*, 261 F. Supp. 3d at 549-50 (concluding that plaintiff "pled sufficient facts to establish Article III standing" when he "intend[ed] to engage in the political process" because it is "beyond question that participation in politics is affected with constitutional interests") (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298

(1979), *aff'd*, 751 Fed. App'x. 269 (3d Cir. 2018)). In other words, Plaintiffs' injuries are likely to repeat because they have happened already, and Plaintiffs sufficiently allege that nothing material will change next time around. Where the Third Circuit has found such a dispute to be unripe, the State has expressly and completely disavowed enforcing the statute in the future. *Tait v. City of Phila.*, 639 F. Supp. 2d 582, 593-94 (E.D. Pa. 2009) (collecting cases), *aff'd*, 410 Fed. App'x. 506 (3d Cir. 2011). Way has not disavowed the Slogan Statutes here, but stands by them.

Similarly, although Plaintiffs have not *yet* entered the 2022 primary, or asked the State for permission to use their original slogans in that race specifically, because they cannot do so until the State releases nominating petitions in December 2021 or January 2022, they are not strictly requesting pre-enforcement review, as Way suggests. They are asking the Court to review a statute that the State has invoked against them once before, under circumstances they insist will recur. Indeed, they have represented in their Verified Amended Complaint that they will reuse their preferred, but rejected, slogans verbatim in 2022. Am. Compl., ¶¶ 26, 40, 46. If declaratory judgment were not entered, Plaintiffs would face a dilemma come primary season: comply with the Slogan Statutes by foregoing their preferred speech, or use speech they know the State will reject purely for the purpose of establishing the basis for a challenge identical to this one. There does not appear to be a path for Plaintiffs to follow to comply with the Slogan Statutes without surrendering what they wish to say on the ballot, short of unexpectedly obtaining consent from organizations or persons who to this point have withheld it. The ripeness doctrine does not put Plaintiffs to such a "Hobson's choice," especially not when they seek to engage in protected activity. *Babbitt*, 442 U.S. at 298 ("When the plaintiff has alleged an intention to engage in a course of conduct, arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of [enforcement] thereunder, he should not be required to await [an adverse

State decision] as the sole means of seeking relief.") (quotations and citation omitted). Accordingly, Plaintiffs' interests are adverse to the State's.

## 2.   Conclusiveness of Judgment

In addition to adverse interests, the parties' dispute "must be based on a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts." *Plains*, 866 F.3d at 542 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)). Two concerns are paramount here: (1) whether the "legal status of the parties would be changed or clarified," *Travelers*, 72 F.3d at 1155, and (2) "whether further factual development . . . would facilitate decision, so as to avoid issuing advisory opinions, or the question presented is predominantly legal." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 344 (3d Cir. 2001).

This prong also favors ripeness. Plaintiffs bring a facial First Amendment challenge to the Slogan Statutes, which presents a predominantly legal question, as with "most First Amendment cases." *Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 426 (W.D. Pa. 2013); *Florio*, 40 F.3d at 1468-69 ("Factual development would not add much to the plaintiffs' facial challenges to the constitutionality of the statute . . . . [it] is of minimal assistance in facial challenges such as this."). Further, there is not "substantial ambiguity as to what conduct [the Slogan Statutes] authorize[]," which might render the legal question inappropriate for judicial resolution at this time. *City of Los Angeles v. Patel*, 576 U.S. 409, 416 (2015). The Statutes plainly (and only) prohibit non-consensual use of any person's name or the name of any incorporated association in New Jersey. Under these circumstances, it is not "impossible to tell whether and to what extent [they] deviate from the requirements of the [First Amendment]," *id.*, and "factual development would [not] significantly advance [my] ability to deal with the legal issues presented." *Med. & Dentistry of*

*N.J. v. Corrigan*, 347 F.3d 57, 68 (3d Cir. 2003) (quotations omitted). The Slogan Statutes are not "susceptible to a wide variety of interpretations" either. *Sibron v. New York*, 392 U.S. 40, 60 (1968).

Even if this case did not present a predominantly legal question, "it is hard to see how a more concrete factual situation would aid resolution of the plaintiffs' First Amendment free speech challenge to the statute." *Florio*, 40 F.3d at 1469; *Armstrong*, 961 F.2d at 412. Plaintiffs allege that they already engaged in proscribed speech, they will do so again in 2022, and the same State law will operate to their detriment then. If I dismissed this case as unripe, their future claims "would most likely parallel those claims already presented in the present action, and as such it is unlikely that there would be any change in the substance or clarity of the challenges to the [Slogan Statutes]." *Florio*, 40 F.3d at 1469. To that extent, whatever judgment I render, it will be conclusive.

### 3.   Practical Utility of Judgment

Finally, I turn to practical utility, which "goes to whether the parties' plans of actions are likely to be affected by a declaratory judgment." *Plains*, 866 F.3d at 543-44; *Step-Saver*, 912 F.2d at 649 (holding that a useful judgment helps parties "make responsible plans about the future"). A judgment in this case will be useful to Plaintiffs no matter the result. "A declaration of [their] rights and those of all others who would seek to engage in similar activity would permit [them] to speak without fear of governmental sanction or regulation of their activities." *Florio*, 40 F.3d at 1470. That is what Plaintiffs seek, and it would give them desired clarity in the 2022 primaries. At the same time, although Plaintiffs maintain that they will resubmit their rejected slogans in 2022, without the requisite consent, I assume that their "willingness to do so is likely to be affected by resolution of this action." *Florio*, 40 F.3d at 1470 & n.13 ("Current First Amendment jurisprudence

does not require a Thoreau or a Gandhi who is willing to go to jail for his beliefs but permits the more cautious Emersons among us to assert our fears of interference with our fundamental rights in the civilized atmosphere of a court before subjecting ourselves to the risk of [enforcement].").

In sum, Plaintiffs have demonstrated that their claims are both not moot and ripe. The crux of Way's opposition is that I cannot hear this case because it is too far removed from 2020, and too far away from 2022. However, my "abiding interest in the constitutionality of the elections process . . . cannot be regulated by adjudging every case unripe before the election or moot after [it]." *Benezet Consulting, LLC v. Boockvar*, 433 F. Supp. 3d 670, 684 (M.D. Pa. 2020) (quoting *Morrill v. Weaver*, 224 F. Supp. 2d 882, 891 (E.D. Pa. 2002) (citing *Meyer v. Grant*, 486 U.S. 414, 425 (1988))). That would place Plaintiffs in a constitutional catch-22 with no clear path to jurisdiction.[6] I may therefore review Plaintiffs' challenge to the Slogan Statutes at this time.

*B. The Constitutionality of the Slogan Statutes*

---

6    This would arguably be made worse by the fact that courts generally decline to upset the status quo, in terms of election procedures, in the run up to an election, and operate under a presumption against last-minute changes. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."). I suspect that the State would invoke the *Purcell* principle if Plaintiffs brought this challenge close to primary day. *Accord Democratic-Republican Org.*, 900 F. Supp. 2d at 461 n.8 ("As in many election related cases, timing is critical . . . . At this late state in the election process, any injunctive remedy ordered by this Court would dramatically upset ongoing ballot printing and distribution.").

Plaintiffs primarily raise a facial challenge[7] to the Slogan Statutes, arguing that the consent provision is an unconstitutional speech restriction regardless of how it is enforced or applied.[8] Am. Compl., ¶ A, at 11. "A facial challenge 'seeks to vindicate not only [Plaintiffs'] own rights, but those of others who may also be adversely impacted by the statute in question.'" *Bruni v. City of Pittsburgh*, 841 F.3d 353, 362 (3d Cir. 2016) [*Bruni I*] (quoting *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 623 (3d Cir. 2013)). Normally, to prevail, a plaintiff must "establish that no set of circumstances exist under which the [law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or show that the law lacks "a plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quotations omitted). But facial challenges in the First Amendment context are "more forgiving." *Bruni v. City of Pittsburgh*, 914 F.3d 73, 84 (3d Cir. 2019) [*Bruni II*]. The Supreme Court has recognized "a second type of facial challenge" in such cases, "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The party seeking to invalidate the law nevertheless bears a heavy burden to demonstrate that it is unconstitutional.

---

7    Plaintiffs do bring an as-applied challenge, which "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). Although the burden is lighter compared to a facial challenge, *see Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998), Plaintiffs' as-applied challenge fails because they do not plead any facts showing that Way enforced the Slogan Statutes against them in an unconstitutional or otherwise irregular manner. *Accord Democratic-Republican Org.*, 900 F. Supp. 2d at 460 ("I do not understand how Plaintiffs' argument in this regard varies from their argument that the statute is facially invalid . . . . [they] do not offer the 'particular circumstances' in which they were deprived of their constitutional rights. Indeed, Plaintiffs have failed to provide any facts or allegations demonstrating that the statute is being applied specifically against Plaintiffs in an unconstitutional manner."). The constitutionality of the Slogan Statutes turns on whether the consent provision may exist at all consistent with the First Amendment, not on how it was enforced in this instance.

8    Although Plaintiffs appear to assert an unqualified right to dictate what appears next to their names on the ballot, Pl. Br. II, at 25 ("This case is about candidates saying whatever they want without restriction, regardless of any government authorization requirement."), I do not construe their Amended Complaint to raise such an across-the-board challenge. My review is confined to the consent provision alone.

*Grange*, 552 U.S. at 450-51 (describing reasons for this including judicial restraint, importance of formulating narrow rules of constitutional law, and desire not to short circuit the democratic process). I must apply the "relevant constitutional test" to resolve Plaintiffs' challenge while keeping "these principles in view." *Bruni II*, 941 F.3d at 83.

i.     The Relevant Constitutional Test Is *Anderson-Burdick*

The parties disagree on what constitutional test applies to the Slogan Statutes. Way initially argues for the sliding scale test set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), and refined in *Burdick v. Takushi*, 504 U.S. 428 (1992). Plaintiffs argue for strict scrutiny, construing the Slogan Statutes as content based speech restrictions. Way disputes whether strict scrutiny applies, but nonetheless argues that, assuming *Anderson-Burdick* does not, intermediate scrutiny is appropriate because the Slogan Statutes are content neutral. I agree with Way that *Anderson-Burdick* is the correct test.[9]

States have for a long time enacted "comprehensive, and in many respects complex, election codes regulating in most substantial ways . . . the time, place, and manner of holding primary and general elections." *Storer v. Brown*, 415 U.S. 724, 730 (1974). In much the same way, although it is "beyond cavil that 'voting is of the most fundamental significance,'" *Burdick*, 504 U.S. at 433 (quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)),

---

9     Where a state election regulation does not burden a right at all, the state need only provide a rational basis for the statute. *Donatelli v. Mitchell*, 2 F.3d 508 514 & n.10 (3d Cir. 1993) (declining to apply *Anderson-Burdick* because plaintiffs' rights not burdened); *Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004) ("*Biener* also cannot establish an infringement on the fundamental right to vote . . . . As the [election] filing fee does not infringe upon a fundamental right, nor is Biener in a suspect class, we consider the claims under a rational basis test.") (citation omitted); *Voting for Am., Inc. v. Andrade*, 488 Fed. App'x. 890, 899 (5th Cir. 2012) (applying rational basis review as opposed to *Anderson-Burdick* because state election law did not implicate or burden specific constitutional rights); *Molinari v. Bloomberg*, 564 F.3d 587, 602 (2d Cir. 2009) (same); *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 310 (S.D.N.Y. 2020) ("Under this framework, election laws that impose no burden on the right to vote are subject to rational-basis review."). There is no dispute here that the Slogan Statutes burden, in some manner, Plaintiffs' First Amendment rights. *See infra*.

"the right to vote in any manner and the right to associate for political purposes through the ballot are [not] absolute." *Id.* (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986)). States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," U.S. Const. Art. I, § 4, cl. 1, and they have even more power over local elections. *Sugarman v. Dougall*, 413 U.S. 634, 647, 93 (1973); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986); *Foster v. Love*, 522 U.S. 67, 69 (1997) ("[The Elections Clause] invests the States with responsibility for the mechanics of . . . elections."). "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." *Burdick*, 504 U.S. at 433. Accordingly, the Supreme Court applies the so-called *Anderson-Burdick* sliding scale test to "a wide variety of challenges to . . . state-enacted election procedures," including those implicating First Amendment rights. *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018).

Under *Anderson-Burdick*, "the rigorousness of [a court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens" protected activity under the First Amendment. *Burdick*, 504 U.S. at 434. Determining the extent of the burden requires "weighing" three factors: (1) the "character and magnitude" of the constitutional injury, (2) "the precise interests put forward by the State as justifications for the burden imposed by its rule," and (3) "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789-90. If, after reviewing these factors, an election administration regulation imposes "'severe' restrictions" on a plaintiff's First Amendment rights, then it is constitutional only if "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). "In

other words, [something like] strict scrutiny applies."[10] *Wilmoth v. Sec'y of New Jersey*, 731 Fed. App'x. 97, 102 (3d Cir. 2018). But if a regulation "imposes only 'reasonable, nondiscriminatory restrictions,'" *Anderson*, 460 U.S. at 788, then "the State need not establish a compelling interest to tip the constitutional scales in its direction." *Burdick*, 504 U.S. at 439. The State must simply show that its "legitimate interests sufficient[ly] . . . outweigh the limited burden." *Id.* at 440. In short, lesser burdens receive lesser scrutiny, while greater burdens require more substantial justifications. *Wilmoth*, 731 Fed. App'x. at 101-02.

Although the *Anderson-Burdick* test is well-defined, the threshold question—*whether* it applies—is not. The Supreme Court has never articulated a general rule or set of factors. *See, e.g.*, *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 192 (1999) (stating that there is no "litmus-paper test" to separate "valid ballot-access provisions from invalid interactive speech restrictions" and "no substitute for the hard judgments that must be made"). Neither, it appears, has any appellate court done so. *See, e.g.*, *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006) ("*Anderson* promulgated a less categorical system of classification . . . . [a court's] scrutiny is a weighing process."); *Ariz. Green Party v. Reagan*, 838 F.3d 983, 990 (9th Cir. 2016) ("The Supreme Court and our sister circuits have emphasized the need for context-specific analysis.").

---

10      In contrast, to determine whether strict or intermediate scrutiny applies to speech that is regulated outside of the *Anderson-Burdick* framework, the inquiry is whether the regulation is content based or content neutral. *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 165 (2015) ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech.") (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (observing that whether a law is content based is often "dispositive"). The nature or size of the burden does not affect the standard of review in this context. *See, e.g.*, *Playboy Entm't Group, Inc.*, 529 U.S. 803, 818 (2000) ("The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans . . . . When the purpose and design of a statute is to regulate speech by reason of its content, special consideration or latitude is not afforded to the Government merely because the law can somehow be described as a burden rather than outright suppression.").

In deciding to apply *Anderson-Burdick* to the Slogan Statutes, I am guided primarily by the Supreme Court's decision in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), in which it utilized the test to reject a First Amendment challenge to Minnesota's "anti-fusion" law, which barred multiple parties from endorsing the same candidate on the ballot. 520 U.S. at 351. The Court in *Timmons* was "unpersuaded . . . that [a party] has a right to use the ballot itself to send a particularized message," explaining that "[b]allots serve primarily to elect candidates, not as forums for political expression," and parties "retain great latitude . . . to communicate ideas . . . through [their] participation in the campaign." *Id.* at 361-63. The Court then invoked *Timmons* in *Grange* to reject a First Amendment challenge to a Washington statute permitting candidates to self-select party designations regardless of which party actually nominated them, and even if the party they selected found them "repugnant." 552 U.S. at 444, 447. The *Grange* Court characterized the law as "unexceptionable," and reiterated that the First Amendment does not guarantee political parties a right to use the ballot for speech or expressive purposes, even where "the State affords candidates the opportunity to [do so]." *Id.* at 453 n.7.

Applying the reasoning in *Timmons* and *Grange* to this case,[11] it is clear that the speech-related consent provision in the Slogan Statutes, though it may prevent Plaintiffs from referencing associations with a person or entity on the ballot in certain circumstances, warrants the *Anderson-Burdick* framework. New Jersey's primary ballots are not "billboards for political advertising," *Timmons*, 520 U.S. at 365, nor are they designed to advance Plaintiffs' campaign-adjacent speech, regardless of whether there is some "connection" or "relationship" between the slogans and

---

[11]     While *Timmons* and *Grange* both concerned the rights of political parties, the Fourth Circuit has reasoned that the same logic applies to candidates, a proposition with which I agree. *Marcellus v. Va. State Bd. of Elections*, 849 F.3d 169, 176 (4th Cir. 2017) (reading *Timmons* and *Grange* to "confirm[] that *local candidates themselves* have no First Amendment right to use the ballot 'as [a] forum[] for political expression' in which to communicate to voters their status as a party's nominee") (emphasis added).

political expression/association. *Fusaro v. Cogan*, 930 F.3d 241, 250-52 (4th Cir. 2019). The ballots are "State-devised forms" that are "necessarily short" and that "do not allow for narrative statements by candidates," and over which the State has wide "discretion in prescribing the particular makeup." *Rosen v. Brown*, 970 F.2d 169, 175 (6th Cir. 1992); *New York State Democratic Party v. Lomenzo*, 460 F.2d 250, 251-252 (2d Cir. 1972) (holding that there is much useful information about parties and candidates that a State is free not to mention or elicit on the ballot, even if physical limitations do not prevent it from doing so); *see also Anderson v. Martin*, 375 U.S. 399, 402 (1964) (describing "the most crucial stage in the electoral process" as "the instant before the vote is cast"). I reached a similar conclusion in *Democratic-Republican Org. of New Jersey v. Guadagno*, 900 F. Supp. 2d 447 (D.N.J. 2012), *aff'd*, 700 F.3d 130 (3d Cir. 2012), where I applied *Anderson-Burdick* to a State election provision which, like the Slogan Statutes, permits unaffiliated candidates to request a party designation of up to three words, with the caveat they may not use the name of a party whose candidates have already qualified for the ballot, such as "Democrat" or "Republican." *Id.* at 461-63; N.J.S.A. § 19:13-4. I made this determination despite plaintiff's contention that the provision "prevent[ed] candidates from meaningfully associating" with the party "of their choice." *Id.* at 462. In doing so, I noted that there is no "fundamental right regarding ballot treatment," and found "*Timmons* to be instructive." *Id.* at 466.

In sum, the Supreme Court has "repeatedly [considered under *Anderson-Burdick*] . . . regulations that have the effect of channeling expressive activity at the polls." *Burdick*, 504 U.S. at 438; *Storer*, 415 U.S. at 728. Of course, like all such regulations, the Slogan Statutes "inevitably affect[]—at least to some degree—the individual's right" to speak about political issues and "associate with others for political ends." *Anderson*, 460 U.S. at 788; *John Doe No. 1 v. Reed*, 561 U.S. 186, 213 (2010) (Sotomayor, J., concurring). But they do so in the context of inherently

"limited ballot space," where there is no fundamental right to mere party designations, much less substantial declarations of political sentiment. *Timmons*, 520 U.S. at 364. The Slogan Statutes are therefore subject to *Anderson-Burdick* sliding scale scrutiny, not a more "conventional and familiar" First Amendment standard of review. *Rogers*, 468 F.3d at 194.

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995), does not command a contrary result. In *McInytre*, the Supreme Court distinguished between laws which regulate "pure speech" on the one hand, and laws which by contrast "control the mechanics of the electoral process." *Id.* at 345. The Court then declined to apply *Anderson-Burdick* to a law prohibiting people from distributing political leaflets without printing the responsible party's name and address on them. *Id.* at 344-47. *McIntyre* is distinguishable because, unlike the Slogan Statutes, leafletting cannot be construed as an "election code provision[] governing the voting process itself." *Id.* at 345. Likewise, contrary to the law struck down in *McIntyre*, the Slogan Statutes stand "a step removed from the communicative aspect" of the regulated conduct, and fall "within the realm" of *Anderson-Burdick* in that regard. *Doe*, 561 U.S. at 213 (Sotomayor, J., concurring); *see also Am. Const. L. Found.*, 525 U.S. at 215 (O'Connor, J., concurring in part) (suggesting "less exacting" scrutiny for regulations which "indirectly burden speech but are a step removed from [its] communicative aspect . . . and are necessary to maintain an orderly electoral process"). Finally, "[s]ince the turn of the century, 'a consensus has emerged' that laws [regarding restrictions on leafletting or petition] circulators 'are subject to strict scrutiny analysis'" rather than something akin to the *Anderson-Burdick* test. *Wilmoth*, 731 Fed. App'x. at 102 (quoting *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 316-17 (4th Cir. 2013)). This consensus "has its genesis in *Meyer* [ ], where a unanimous Supreme Court held that Colorado's criminalization of paid petition circulators amounted to an unconstitutional restriction on 'core political speech.'" *Id.* (quoting 486 U.S. at

422). Critically, in *Meyer*, the Court observed that "the circulation of a petition involves the type of interactive communication concerning political change" for which First Amendment protection "is at its zenith." 486 U.S. at 421-22. *McIntyre* thus does not change the conclusion that *Anderson-Burdick* governs my constitutional inquiry into the Slogan Statutes.

> ii.    Applying *Anderson-Burdick* to the Slogan Statutes

As discussed *supra*, under *Timmons* and *Grange*, Plaintiffs do not have a right to speak through the ballot. New Jersey could presumably repeal the Slogan Statutes altogether without running afoul of the First Amendment, and did not need to enact them in the first place. *See, e.g.*, *Rosen*, 970 F.3d at 175 ("With respect to the political designations of the candidates on nomination papers or on the ballot, a State could wash its hands of such business and leave it to the educational efforts of the candidates themselves, or their sponsors, during the campaigns."); *Bachrach v. Sec'y of Com.*, 382 Mass. 268, 273 (1981) ("There is certainly much useful information about parties and candidates that a State is free not to mention or elicit on the ballot, even if physical limitations do not prevent [it].").

But once a State "admits a particular subject to the ballot and commences to manipulate the content or to legislate what shall and shall not appear, it must take into account the provisions of the Federal and State Constitutions regarding freedom of speech and association." *Rosen*, 970 F.3d at 175; *Riddell v. Nat'l Democratic Party*, 508 F.2d 770, 775-79 (5th Cir. 1975) ("While it is true that the administration of the electoral process is a matter that the Constitution largely entrusts to the states, in exercising their powers of supervision over elections 'the states may not infring[e] upon basic constitutional protections,' and 'unduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments.'") (quoting *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973)). That is, the State must exercise its election-

related discretion in subordination to relevant constitutional guarantees. *Bullock v. Carter*, 405 U.S. 134, 140-41 (1972). *Anderson-Burdick* safeguards the relevant constitutional guarantees in this matter, and I account for Plaintiffs' First Amendment rights to speech and association on the ballot in the context of its framework. The State, recognizing this, does not take the position that Plaintiffs are entitled to less than *Anderson-Burdick*.

## 1. The Magnitude of the Burden

With *Anderson-Burdick* as the standard, I now address the extent to which the Slogan Statutes burden Plaintiffs' rights, which determines whether the Statutes must be narrowly tailored to a compelling state interest or must merely "outweigh" a legitimate state concern. *Wilmoth*, 731 Fed. App'x. at 102. "Strict scrutiny [ ] is appropriate only if the burden is severe." *Clingman v. Beaver*, 544 U.S. 581, 582 (2005). If it is not severe, then lesser scrutiny is appropriate, and the State's "important regulatory interests will usually be enough." *Timmons*, 520 U.S. at 351.

"Burdens are severe if they go beyond the mere inconvenient." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring in the judgment) (quoting *Storer*, 415 U.S. at 728-29). "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 177 (2d Cir. 2020). Burdens generally are not severe if they require "nominal effort" from everyone, *Crawford*, 553 U.S. at 205 (Scalia, J., concurring in the judgment), or if they are "ordinary" and "widespread." *Clingman*, 544 U.S. at 593-97. Beyond these guideposts, I must make "a careful, ground-level appraisal [ ] of [the] burdens" from a "practical" perspective. *Crawford*, 553 U.S. at 210-11 (Souter, J., dissenting) (citing *Burdick*, 504 U.S. at 434). To begin, I do not have any information before me suggesting that the act of obtaining consent, or the process of filing it in written form with the Division of Elections, burdened Plaintiffs. They do not allege that seeking approval from various people or

groups proved prohibitive or even difficult. However, the "relevant" burdens must also be "those imposed on" candidates who *have not* obtained the requisite consent, or who cannot do so. *Crawford*, 553 U.S. at 198 ("The burdens that are relevant to the issue before us are those imposed on persons who are eligible to vote but do not possess a current photo identification that complies with the requirements of SEA 483."). Viewed through this lens, the Slogan Statutes may pose obstacles as a general matter. For instance, a candidate may not have easy access to the person she wishes to name; may not know who from an incorporated group to ask for consent or where to find them; may need to go to great lengths or inconvenience to convince someone to agree to an association; or may need to offer concessions in return. These are non-trivial burdens arising out of the consent provision.

Determining the magnitude of the burden further requires considering its "likely" consequences "*ex ante*," "categorically," and on "[candidates] generally." *Crawford*, 553 U.S. at 206 (Scalia, J., concurring in the judgment) (quoting *Storer*, 415 U.S. at 738). I can perceive three in this case. First, the Slogan Statutes may chill speech if candidates suspect that they will never be able to obtain consent from someone they wish to name. *Cf. Lamont v. Postmaster General*, 381 U.S. 301, 309 (1965) (Brennan, J., concurring) (writing that the First amendment protects against government "inhibition as well as prohibition"). Second, the Statutes may force Plaintiffs to change what they say altogether if a named entity withholds consent (for whatever reason), or only consents if the message is sufficiently favorable to it. This could channel dissenting, negative, controversial, or unpopular slogans into more tolerable forms or benign/positive tones. *Cf. Matal v. Tam*, 137 S. Ct. 1744, 1763 (2019) ("Giving offense is a viewpoint."). As pled, McCormick arguably experienced a similar situation: she could not obtain consent from Bernie Sanders for her slogan stating that he "Betrayed the NJ Revolution." Am. Compl., ¶¶ 43-44. Third, the Statutes

may undercut "the potential power of [naming a person or group] as a signal to voters of a candidate's ideological bona fides," a valuable voting cue without which a candidate may face "a potentially serious handicap 'at the climactic moment of choice' in the voting booth." *Soltysik*, 910 F.3d at 442 (quoting *Rosen*, 970 F.2d at 175); *see also Tashjian*, 479 U.S. at 220 ("To the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise."). For these reasons, the Slogan Statutes impose more than a slight burden.

That said, the Statutes do not impose a *severe* burden. Plaintiffs, first, do not allege how frequently the Slogan Statutes thwart certain classes of candidates, whether those candidates share any characteristics, or how common it is for individuals or incorporated associations to withhold consent. Based on the Amended Complaint, I can only infer that it happens occasionally, and that consent is not automatic in every case. *Cf. Crawford*, 553 U.S. at 202 ("The record says virtually nothing about the difficulties faced by either indigent voters or voters with religious objections to being photographed . . . . [a] single affidavit gives no indication of how common the problem is."). "[N]ailing down precisely how great the cohort of discouraged or totally deterred [candidates] [is] . . . . of course [ ] would greatly aid a plaintiff to establish his claims." *Id.* at 222 (Souter, J., dissenting).

What is more, certain aspects of the Slogan Statutes indicate both neutrality and narrowness. By their terms, the Statutes do not draw any classifications or distinctions, but rather impose a single burden uniformly on all candidates for office: obtain consent to name someone or some incorporated association. The Statutes also regulate just six words on the primary ballot, the purpose of which is already limited to conveying alignment within a political party, do not extend

to groups incorporated outside of New Jersey, and do not outright prohibit any speech. Candidates may, in short, say whatever they want about a person or group if they get consent, and whatever else if they avoid using certain names. And, in the end, it is not the State, but third parties, who impose on Plaintiffs' speech rights, since it is the latter alone who decide whether to consent. I am hard-pressed to view these burdens as severe. *Fusaro*, 930 F.3d at 260 ("[The] state is not constitutionally required to eliminate every logistical barrier in administering its regulatory regime for elections."); *see also Burdick*, 504 U.S. at 433 ("[T]he mere fact that a State's system creates barriers . . . does not itself compel close scrutiny.").

It also matters that the Slogan Statutes regulate just one speech opportunity in the scheme of a primary season with many other—and more substantial—opportunities to speak, and they have no impact on what candidates may say outside the confines of the ballot. *See, e.g.*, *Anderson*, 460 U.S. at 788 ("[A]n election campaign is an effective platform for the expression of views on the issues of the day."); *Socialist Workers Party*, 440 U.S. at 186 ("[A]n election campaign is a means of disseminating ideas."); *Timmons*, 520 U.S. at 361 ("The New Party remains free to endorse whom it likes, to ally itself with others, to nominate candidates for office, and to spread its message to all who will listen."); *Marcellus v. Va. St. Bd. of Elections*, 849 F.3d 169, 177 (4th Cir. 2017) ("[T]he candidates still have every other avenue by which to inform voters of this information. Political parties and their nominees are entirely free to publicize their association with each other and may even distribute sample 'party' tickets on election day."); *Fusaro*, 930 F.3d at 260-61 (explaining, while remanding with instructions to apply *Anderson-Burdick*, that "other means of communication remain open" to plaintiff such as "billboards," "newsletters," "the internet," or "simply [ ] mailing [a] letter to any[one] in the phone book"); *Miller v. Brown*, 503 F.3d 360, 368 (4th Cir. 2007) (holding that First Amendment associational

rights were not burdened where Virginia provided "multiple options" for political parties to vindicate those rights). Plaintiffs have not offered anything to the contrary, such as facts suggesting that other speech opportunities are "neutralize[d]" by the Slogan Statutes. *Cf. Rosen*, 970 F.2d at 173 ("The absence of a label [on the ballot] gives rise to mistrust and negative inferences [because it denies] the identification [the candidate] had worked to establish at the crucial moment of choice in the election campaign [and makes voters question the authenticity of the candidate's affiliations when explained on the campaign trail]."). In other words, Plaintiffs retain full constitutional flexibility to express associations with people or groups throughout the campaign, in other forums, and by other means. *Timmons*, 520 U.S. at 363-64. The Slogan Statutes do not impose a severe burden to that extent, and because they are not "at the far end of the scale" in terms of restrictiveness, *Soltysik*, 910 F.3d at 444, strict scrutiny is inappropriate.

### 2.   The State's Interests

Having established the magnitude of the burden, I turn next to the State's interests, which must be "relevant and legitimate" or "'sufficiently weighty'" for the Slogan Statutes to survive. *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288-89). My review at this stage is "quite deferential," *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008), so as not to "hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Clingman*, 544 U.S. at 593. Way asserts four interests: preserving the integrity of the nomination process, preventing voter deception, preventing voter confusion, and protecting the associational rights of third parties who might be named in a slogan. I find that Way has raised sufficiently weighty interests in this context.

Preserving the integrity of the nomination process is not just an important interest, but a compelling one. *See, e.g.*, *Rosario v. Rockefeller*, 410 U.S. 752, 760-62 (1973) (stating, in the

context of a challenge to New York's "delayed enrollment" primary, that "preservation of the integrity of the electoral process is a legitimate and valid state goal"); *Eu v. San Francisco Cty. Dem. Cent. Comm.*, 489 U.S. 214, 231 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); *id.* ("We have also recognized that a State may impose restrictions that promote the integrity of primary elections."); *American Party of Texas v. White*, 415 U.S. 767, 779-80 (1974) (interest sufficient to support requirement that major political parties nominate candidates through primary but minor parties nominate candidates through conventions); *id.* at 785-86 (interest sufficient to support limitation on participation to one primary and ban on both voting in a party primary and signing a petition supporting an independent candidate); *Bullock*, 405 U.S. at 145 (interest sufficient to support reasonable filing fees as a condition of placement on the ballot to stop "frivolous or fraudulent candidacies"). This interest is closely related to safeguarding public confidence *in* the nomination process, which "has independent significance, because it encourages citizen participation." *Crawford*, 553 U.S. at 197. Encouraging participation is important in its own right. *See, e.g.*, *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 671 (D.S.C. 2011) (finding "promoting voter participation in the electoral process" to be important); *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 393 (W.D. Pa. 2020) (same).

The State also has an important interest in preventing voter deception. *See, e.g.*, *Norman*, 502 U.S. at 290 (acknowledging an interest in preventing "misrepresentation"); *Timmons*, 520 U.S. at 365 (same, and noting possibility that "candidates may exploit fusion as a way of associating . . . with popular slogans and catchphrases"); *Jenness v. Fortson*, 403 U.S. 431, 442 (1971) ("There is surely an important state interest . . . in avoiding . . . deception, and even frustration of the democratic process at the general election."). Likewise, the State has a substantial interest in

preventing voter confusion. *See, e.g.*, *Lubin v. Panish*, 415 U.S. 709, 715 (1974); *Jenness*, 403 U.S. at 442; *Tashjian*, 479 U.S. at 221-22 (recognizing "[t]he State's legitimate interests in preventing voter confusion and providing for educated and responsible voters"); *Bullock*, 405 U.S. at 145 (same); *Anderson*, 460 U.S. at 796 ("There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will."). Protecting the associational rights of third parties who may be named in slogans is closely correlated with these interests because it effectively assures voters that candidates have accurately portrayed information.

Moreover, while Way's asserted State interests must be grounded in some basis, she need not provide "elaborate, empirical verification" for me to credit them. *Timmons*, 520 U.S. at 352, 364; *Munro*, 479 U.S. at 194-95 (rejecting "a particularized showing of the existence of voter confusion . . . to the imposition of reasonable restrictions on ballot access"). This is especially so where, as here, "the burden a challenged regulation imposes . . . is [not severe.]" *Soltysik*, 910 F.3d at 448. The Seventh Circuit goes so far as to hold, in the context of *Anderson-Burdick*, that "[e]ven a speculative concern of voter confusion" suffices as a matter of law to establish a legitimate State interest. *Stone v. Bd. of Election Comm'rs*, 750 F.3d 678, 685 (7th Cir. 2014). The Ninth Circuit disagrees, and has held that a State's informational interest must be substantiated to some degree or else *Anderson-Burdick* becomes nothing more than "ordinary rational-basis review." *Soltysik*, 910 F.3d at 448. The Third Circuit seems to side with the Ninth Circuit. *Patriot Party of Allegheny Cty. v. Allegheny Cty. Dep't of Elections*, 95 F.3d 253, 266 (3d Cir. 1996) ("As a factual matter, there is no evidence in the record to support the proposition that myriad small parties will 'clog' the ballot if cross-nomination is permitted . . . . The Department has presented no evidence to indicate that fusion is likely to produce a crippling proliferation of minor parties."). Nonetheless,

in this case, the Slogan Statutes aim to further New Jersey's informational interests in a practical, and not purely theoretical, manner: voters may have confidence that, when they cast ballots, any claimed associations or references to such associations are accurate and reflect true political alignments/relationships. To that extent, the State's interests rise above the sort of "theoretically imaginable" interests which the Supreme Court has rejected, *Williams v. Rhodes*, 393 U.S. 23, 33 (1968), and of which the Third Circuit is generally skeptical. *Patriot Party*, 95 F.3d at 266.

### 3. Balancing the Burden Against the Interests

Plaintiffs largely do not challenge the State's interests. They instead focus on the means-end fit between the interests and the Slogan Statutes. The gist of their argument is that the State could place a general disclaimer on ballots alerting voters to the fact that slogans are unverified, which would be less speech intrusive. *Marcellus*, 849 F.3d at 178 ("While the plaintiffs 'do not dispute the legitimacy' of those interests, they challenge whether [the statute's] restriction serves those interests.").

The flaw in Plaintiffs' position is that New Jersey's integrity and informational interests need only "outweigh" the Slogan Statute's burdens. *Burdick*, 504 U.S. at 439; *Wilmoth*, 731 Fed. App'x. at 102. *Anderson-Burdick* does not require the State to choose the least restrictive alternative of all feasible alternatives available to it. In fact, "the State need not narrowly tailor the means it chooses to promote ballot integrity" at all. *Timmons*, 520 U.S. at 365. Hence, while a general disclaimer may better serve Plaintiffs' political strategies, "[t]he Constitution does not require that [New Jersey] compromise the policy choices embodied in its ballot-access requirements to accommodate [that]." *Id.* It is not difficult, in any event, to understand how New Jersey could reasonably conclude that the Slogan Statutes serve its ends: they ensure only legitimate associations appear on the ballot, at "the climactic moment of choice" for voters when

they do not have time to investigate or verify what they read, and must instead take it at face value. *Rosen*, 970 F.2d at 175; *Anderson*, 375 U.S. at 402.

In short, here, the State has chosen to minimize certain risks when slogans include names of persons or entities who may be improperly referenced, such as creating misleading or false impressions in voters' minds, which could sway an election outcome at the last minute or throw a result into doubt with allegations of deception. I cannot find that policy choice to be unreasonable, illegitimate, or otherwise not "sufficiently weighty to justify" the ancillary burdens that flow from it. *Crawford*, 553 U.S. at 191. "So long as [the State's] choice is reasonable and neutral," as in this case, then "it is free from judicial second-guessing." *Weber v. Shelley*, 347 F.3d 1101, 1107 (9th Cir. 2003) ("[I]t is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems."); *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 108 (2003) ("[That] the line might have been drawn differently . . . is a matter for legislative, rather than judicial, consideration."); *Trinsey v. Com. of Pa.*, 941 F.2d 224, 235 (3d Cir. 1991) ("We take no position on the balancing of the respective interests in this situation. That is a function for which the legislature is uniquely fitted."). I therefore hold that Plaintiffs have not plausibly alleged that the consent provisions in the Slogan Statutes are unconstitutional.[12]

---

[12]    I note that, unlike this case, many decisions in the *Anderson-Burdick* line arise from summary judgment proceedings. *See, e.g.*, *Crawford*, 553 U.S. at 181; *Timmons*, 520 U.S. at 355; *Munro*, 479 U.S. at 192-93; *Jenness*, 403 U.S. at 432-33. This is indicative of a post-*Crawford* trend toward establishing a robust factual record to characterize an alleged burden. *See, e.g.*, *Nelson v. Warner*, 477 F. Supp. 3d 486, 493 (S.D. W. Va. 2020) (relying heavily on expert witnesses and statistical analysis). Even so, courts also resolve *Anderson-Burdick* cases at the dismissal stage, because the nature of the Rule 12(b)(6) inquiry is whether a plaintiff has stated a claim for relief, not whether discovery may be warranted. *See, e.g.*, *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 718 (4th Cir. 2016) (dismissing case on Rule 12(b)(6) motion despite request for "development of a full factual record" and proposed expert testimony). Here, it is appropriate to decide Plaintiffs' claims at the dismissal stage because they do not assert a factual burden (*i.e.*, that it is difficult to obtain consent) but rather a legal burden (*i.e.*, that they have to ask for consent in the first place). Discovery thus would not benefit the resolution of their claims or change the nature/magnitude of the burden imposed by the Slogan Statutes. *Cf. Soltysik*, 910 F.3d 447 ("[A] remand for further factual development is warranted here.").

### C.  Plaintiffs' Claims Against the Clerks

My determination above that the Slogan Statutes are not unconstitutional ends the inquiry as to the claims against the Clerks. But even had I resolved that question in Plaintiffs' favor, they nonetheless have not sufficiently pled that *the Clerks themselves* committed a constitutional violation. Plaintiffs assert that the Clerks had discretion to print their preferred slogans, notwithstanding Way's determination that the slogans violated the Slogan Statutes and could not appear on the ballot, but did not do so in violation of the First Amendment. But Plaintiffs' pleadings belie their own position. *See, e.g.*, Pl. Br. I, at 2 ("The Slogan Statutes forbid a New Jersey county clerk from printing any slogan that [does not comply therewith]."). And, indeed, Plaintiffs plead it correctly. Under N.J.S.A. § 19:23-25.1, "[n]o . . . slogan shall be printed on the ballot . . . which . . . includes or refers to the name of any other person unless the written consent of such person has been filed." *Id.*; *MacManus v. Allan*, 2 N.J. Super 557, 559 (1949) ("Certainly the duty of the Town Clerk is to print only what complies with the law."). This, among other things,[13] forecloses Plaintiffs' theory of liability as to the Clerks. While the Clerks have significant election-related discretion under other State laws, *see, e.g.*, N.J.S.A. § 19:14-12 (position of candidates' names on the ballot), they appear to have done nothing more in this case than print and "transmit [the slogans approved by the Division of Elections] to the Election Law Enforcement Commission in the form and manner prescribed by the commission," N.J.S.A. § 19:23-14, consistent with State law, which is insufficient to support Plaintiffs' contention that the Clerks worked a First Amendment harm against them.

### IV.    CONCLUSION

---

13    For instance, Plaintiffs allege that they filed their nominating petitions with Way not the Clerks, *see* N.J.S.A. § 19:13-12, and communicated with the Division of Elections only about their rejected slogans. They also allege that Way is the chief election official in the State who is charged with enforcing the Slogan Statutes.

Plaintiffs have not plausibly stated a First Amendment claim that the consent provisions in N.J.S.A. §§ 19:23-17 and 25.1 violate the First Amendment under *Anderson-Burdick*. Accordingly, I **GRANT** Way's dismissal motion. I also **GRANT** the Clerks' motion and **DISMISS** the claims against them.

**DATED**: July 30, 2021                                  /s/ Freda L. Wolfson
                                                         Hon. Freda L. Wolfson
                                                         U.S. Chief District Judge